IN THE

# SUPREME COURT OF JUDICATURE

OF THE

## STATE OF NEW JERSEY.

### FEBRUARY TERM, 1888.

---

## BARCLAY W. PEAK v. THE STATE OF NEW JERSEY.

1. In criminal procedure the forty-eight names of jurors constituting the list to be served on the prisoner is to be selected by the sheriff, at discretion, from the general panel; these names are not to be drawn from the box.
2. The act of 1881 (*Pamph. L.*, p. 49), requires such names to be drawn from the box in making up the trial jury.
3. In selecting the forty-eight names the sheriff must alone perform the duty; if the prosecutor of the pleas co-operates in the act, a conviction founded on such proceedings will be reversed on error.
4. In order to make dying declarations admissible, the state must make it plainly apparent that the declarant has given up all hope of life, and believes that death is impending.
5. When the surgeon told the patient she might die at any moment, and that there was but one chance, from a contemplated operation, and the patient said she did not expect to recover, but would like to, and the conditions of the situation did not control such expression—*Held*, that the statements of the patient then made were not admissible, on the ground that it was not shown that such declarant had given up all hope of life.

---

On error to Burlington Oyer.

179

Argued at November Term, 1887, before BEASLEY, CHIEF JUSTICE, and Justices DIXON, REED and MAGIE.

For the plaintiff in error, *J. Frank Fort* (with whom were *Samuel K. Robbins* and *Robert S. Gaskill*).

The prisoner, Barclay W. Peak, was convicted of the murder of Mary Catherine Anderson, at the April Term, 1887, of the Court of Oyer and Terminer of the county of Burlington.

During the progress of the trial, which lasted several days, a number of exceptions were taken to the rulings of the court, the chief of which relate to the empaneling of the jury, to alleged dying declarations of the deceased, and to the admission of certain testimony of a physician as expert evidence.

The record of the case is over thirteen hundred pages. In reviewing the several exceptions, I shall refer to them by number, somewhat out of the order they appear in the case, without quoting them at length.

### AS TO THE SECOND EXCEPTION.

The second exception has in it a point going to the very foundation of the administration of criminal justice and the constitutional right of a speedy and public trial by an impartial jury. Two grounds of challenge to the special panel were raised :

First. That the list of forty-eight names specially drawn and served on the defendant pursuant to law was improperly drawn, or, correctly speaking, not drawn at all, but selected at will from the list.

Second. That the selection as made, if legal in the method, was illegally done, as the same was not done by the sheriff, but by the sheriff and prosecutor of the pleas.

As to the first point, it is contended that the sheriff cannot select at will names of jurors for the panel to try a prisoner, but must select the forty-eight names by drawing so many from the general panel of jurors returned for the term, as will make said list. It is insisted that the act of 1881 (*Pamph L., p.* 41) so requires it to be done.

Peak v. State.

## AS TO THE SECOND POINT.

Section 66 (*Rev.*, *p.* 279) of the Criminal Procedure act provides that the accused, in murder cases, shall have a copy of the indictment and a list of the jury delivered to him two entire days at least before the trial; and by the seventy-second section of said act (*Rev.*, *p.* 280) it is expressly provided that it shall be the duty of the sheriff to select such panel, or a list of forty-eight jurors from the general panel, or list of jurors that may have been drawn and summoned to attend as jurors at the term at which such prisoner is to be tried.

This duty is a mandatory one, and must be performed solely, and without influence or assistance, by the sheriff; any intermeddling taints it with fraud, and would avoid the panel and make its selection illegal and void. The unrefuted offer made was to show that the sheriff did not select the list, but that the sheriff and the prosecutor of the pleas so selected it.

If the prisoner's attorney had been with the sheriff and assisted in the selection of the jury, will it be said for a moment that the court would not quash the panel and order another? Can the prosecutor of the pleas stand in any better relation?

The constitution of the United States guarantees, by the fifth article of amendment thereto, to the accused, in all criminal cases, the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed.

By the constitution of New Jersey (art. 1, ¶ 8) it is enumerated among the rights and privileges of citizens, that in all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury. These constitutional provisions are far-reaching in their character, and intended to protect a person accused of crime, in the strictest fulfilment of statutory and common law requirements as to the composition and manner of drawing the jury who are to determine his case. It would be a monstrous proposition, abhorrent to every principle of fairness and impartiality, to

permit the public prosecutor to have voice in the selection of the jury to try a defendant, whom he is to prosecute, standing accused of crime. The statute fixes the duty of the selection of the jury in the sheriff, who is the sworn officer, and by virtue of his office presumes to stand independent and indifferent, and with perfect impartiality between the state and the accused, while the prosecutor does not stand indifferent, but stands as the sworn attorney to prosecute the defendant.

The fact that the jury were selected from the general panel without being drawn from the box at random, if done by the sheriff, might not of itself have been considered if the court shall be of opinion that the sheriff may lawfully select a special panel other than by drawing it from the box, but when it is done and exception is taken on that ground, and it is not denied, and from the record it stands admitted that such selection was not the impartial and unbiased act of the sheriff himself, but was the act as well *of the public prosecutor*, such a selection must, in face of the statute, which is mandatory as to the duty of the sheriff, avoid the special panel and upon the exception by the defendant require the court to quash. From the record it may have been in the power of the counsel of the prisoner to have shown that a large majority of these men were selected by the prosecutor. This question goes to the very foundation of the administration of criminal justice.

In State *v.* Patterson, it was held by this court that upon an exception of this character being taken to the refusal of the court to inquire into the alleged irregularities, in disposing of the exception, it would be treated as if the facts offered to be shown were true, and that if such facts had been shown, and they would, in the judgment of the court, have required the court to have quashed the panel of jurors as returned, it would be the duty of the court to set aside the verdict and grant the prisoner a new trial. *State* v. *Patterson*, 19 *Vroom* 381.

### AS TO THE FIFTH EXCEPTION.

The fifth exception relates to the admissions of alleged dying declarations made by the declarant to Dr. William H. Pancoast, and stated by the witness as follows: "I asked, first, if she had shot herself; she answered 'No.' I asked her how she received her wounds—who shot her; then she answered me 'Bart.' I asked her that in two or three different ways."

It is respectfully insisted that the admission of this testimony, which was an alleged dying declaration made on the 13th of February, six days after the shooting, was not justified under the testimony that had then been given in the cause touching the question of the condition of the mind of the declarant, and that the evidence did not then show, to a moral certainty, that the declarant, at the time of making the statement, had an abiding impression of almost immediate dissolution, as required by law. At this time the declarant was neither without hope nor without reason of hope. Dr. Pancoast, the witness to whom the declaration was made, had on that day advised the father, as the means of saving the life of the child, to have an operation performed to search for the bullet. The most that Dr. Brown, her attending physician, had said to her up to that time, was that she was liable to die at any hour, or might die at any hour. Neither the witness Chambers, nor the witness, Benjamin Stratton Colkitt, nor the witness, Alvah Colkitt, testified as to any statement by Kittie. The witness, Mary Magee, had testified that on Thursday, the 10th, she had said to Kittie: "Kittie, you do not know me," and that she shook her head no; and that she further said to her: "When you get well you can come down and see me and we will be good friends," and that the shook her head; and that she further said to her: "You expect to get well, don't you, Kittie?" and she shook her head.

In answer to a question by the court as to whether she said to the witness she did not expect to get well, the witness said: "No, she did not say that, and that she [the witness] only

was indicating how Kittie had shaken her head." This testimony would clearly not be enough to admit a dying declaration.

This same witness testified to the following conversation between Kittie and her father. Her father said: "Kittie, you will soon be well, and you and Mrs. Magee will be great cronies." She shook her head, and then the witness adds this statement, "That is all I ever heard her say anything about getting well."

Neither of these statements by Mrs. Magee can be claimed as the basis of an opinion to found a belief upon that there was an impression in Kittie's mind that she did not expect to get well. The first statement of this witness may just as well apply to a meaning by her that she did not know the witness, and did not intend to come and see her when she got well, or even to a desire on the part of Kittie that she requested them to cease talking, or any other inference. As to the second statement of the witness, it would be a strained inference to say that by her shaking her head she meant that she had no hope of life.

At the same interview, or during the same day, Kittie had said to Amanda Peak, who was making a noise or talking in a loud voice about her bed, "If you don't be still I will make you." Kittie had stated when given a drink by Mrs. Alice Dennis, "Give it to me faster; I am dry"; and in answer to Mrs. Dennis' questions from day to day, "Well, Kittie, how do you feel to-day?" sometimes she would say, "Oh, pretty rough," sometimes "pretty fair," and she would say to Mrs. Dennis, "good morning" and "good evening" when she came and went.

Eva D. Anderson, her sister, says that Kittie, on Friday the 11th, not knowing that her Aunt Mary Jane was there, said when she saw her there, "Why, Aunt Mary Jane." This witness further testifies that Doctor Brown had told Kittie that day that she was liable to die any hour, and asked her if she expected to get well, and she said, "No, she did not expect to get well, but she would like to get well."

This same witness testifies that Doctor Brown told Kittie she was liable to die any hour, and she must tell the truth, and asked her if she wanted to get well, and she said, "Yes." She said she didn't expect to get well; she always said she wanted to get well, but she couldn't get well. This same witness says that she had bought a pair of new shoes and showed them to Kittie, who said they were nice, and that she would like to have a pair like them. She then told her that she would give her money to get a pair when she got well, and Kittie replied that she would never get well, and then the witness said, "You want to get well, don't you, Kittie?" and she said, "Yes." This same witness says that she began to get better, and asked for things on Thursday, the 10th, and Friday, the 11th, and this is the evidence of Doctors Brown and Pancoast.

Doctor Brown, the attending physician, had testified to some statements made by him to the girl, and as to her condition prior to February 13th, the date that Doctor Pancoast received the statement. The doctor says that on February 11th, the declarant had recovered and recognized him, and he states that he said to her on that day about these words, "that in her condition of impending death, she ought to state, or make a statement, as to how she came by that wound," and that on the same day he said at her bedside, so that she could hear it, "that she was liable to die at any moment." This witness further states that he does not remember any words of encouragement spoken to Kittie on the 13th, but admits he had told her "that her only chance to live was through an operation."

"*Q.* You did not hold out the hope that she might live?"

"*A.* That there might be—that would be the only chance for her recovery.

"*Q.* You had told her that, had you not?

"*A.* Yes, sir.

"*Q.* When did you tell her that?

"*A.* I told her that previous to the 13th—to the first operation, I think, about two days; I think it was on the 11th."

This same witness says that Dr. Pancoast told her that he would perform the operation " to give her a chance for life."

I submit that there is not a line in his testimony up to this time that fixes definitely any statement to the declarant, or heard by her, made on the 13th, at the time of the alleged declaration to Pancoast, that led her to believe, or that tended to fix an impression upon her mind, that she could not ultimately recover; but, on the other hand, if anything is to be gathered from his testimony, it is that the declarant was in such a state of mind that she believed, and had been led to believe, that there was hope of life through an operation.

The next witness for the state is John T. Naylor, whose testimony I respectfully submit can have no bearing whatever on the alleged condition of the mind of the declarant on the 13th instant, as what he testifies to occurred on the 11th. He says that her sister roused her up and said, "Kittie, you are very sick, ain't you?" She nodded "yes." Then she said, "Kittie, do you think you will get well?" She shook her head "no." Then she said, "Kittie, you want to get well, though?" Kittie nodded her head "yes." Was this without hope?

Louisa Colkitt, the next witness called, gives no testimony on the subject of any statement as to the physical condition of Kittie, or of any declarations by her as to whether she expected to get well.

The next witness was Joanna W. Anderson, the mother of Kittie, who stated that Kittie was a great deal better on Friday, the 11th, and took notice and knew everybody. She refers to a conversation that day, in which the doctor stated to her that she might die, and to her repeating a child's prayer that night on going to bed, the repeating of which prayer, I respectfully submit, was the most natural and hopeful thing that the testimony indicates she had yet done. This witness says, in a general way, that whenever she asked her if she would get well she would shake her head "no," but always in answer to the question if she wanted to get well, she would say "yes."

We now come to the testimony of Dr. Pancoast, whose statement of circumstances and dates is much confused. He states that he told her "his judgment was she would not get well from the injury to her brain; he thought the chances were against her." It would appear doubtful from his answer whether this statement was made in her presence, and also whether it was made at the second or first operation, for he says that at the operation he did not tell her "that the operation would cause her death, or the injury her life, or put her life in danger." The next sentence in the answer would indicate that this was the 13th, because he says she was relieved by the operation of removing the pieces of bone and the clot. He speaks of an instantaneous and decided relief to the declarant on the 13th instant, so much so that it struck us as remarkable; it was observed upon, and surprised us all. He says, "She at once grew brighter; her face assumed a more natural expression; she responded intelligently, and was so distinctly restored to consciousness, and was so wonderfully much improved, that I simply limited myself." The doctor refers to dates subsequent to the 13th, and up to Thursday, February 24th, and to the inductive balance experiment of March the 9th. He again recurs to the first operation performed on the 13th, and says he stated to the declarant that he proposed to examine the wound and might operate on it; "that of course it was attended with danger, and that she might possibly die, though he did not think she would, and she must recognize the fact that her life was about to be imperiled."

The doctor evidently repeats his version of the same conversation, and says he told her "she might possibly die, but that he believed she would survive the operation, and that if she had anything to say it was time to speak." The doctor states that she stated to him that she "did not expect to get well; that she thought she was going to die." That covers the entire testimony previous to the admission of the dying declaration. The question now is whether the state of facts before the judge justified the admission of this evidence.

In *State* v. *Donnelly*, 2 *Dutcher* 618, the Court of Appeals have laid down the rule under which such declarations as these may be offered, and this case declares that at the time of making the declaration the declarant must be under " an abiding impression of almost immediate dissolution." It is not enough that the declarant says " she should never recover," and the rule in New Jersey follows the rule laid down in England in *Rex* v. *Van Butchell*, in 1829, found in 3 *Car. & P.* 629, in which Hullock, Baron, declares the rule to be " that the principle on which declarations *in articulo mortis* are admitted in evidence, is that they are made under an impression of almost immediate dissolution. A man may receive an injury from which he may think that he shall ultimately never recover, but still that would not be sufficient to dispense with an oath."

I further insist that the uniform expressions of the declarant that " she wanted to recover " were hope for a recovery, and it is well settled that if the declarant had any expectation or hope of recovery, however slight it may have been, and though death ensue in an hour, such declarations are inadmissible; they cannot be admitted if she thought she had some slight chance of life, and the testimony shows that both Dr. Brown and Dr. Pancoast held out to her at this very time, and previously on the 11th, two days before, that by an operation " she might recover," as Dr. Brown stated it, and " there was a chance for her recovery," as Dr. Pancoast stated it. *Commonwealth* v. *Roberts*, 108 *Mass.* 296 (301); *Commonwealth* v. *Haney*, 127 *Mass.* 455 (457); *People* v. *Evans*, 14 *Hun* 492; *People* v. *Hodgdon*, 55 *Cal.* 72.

Aside from the statement of the declarant " that she did not expect to recover but wanted to recover," and of the statement of the doctor made in her presence that she " was liable to die," there is no fact or circumstance in this case going to show that the declarant was under an abiding impression of almost immediate dissolution; on the other hand, the circumstances and acts of the deceased, and the statements of the family made to her, and the unquestioned rapid improvement

in the condition of the declarant from Thursday, the 10th of February, to Thursday, the 24th ; the great improvement in her physical condition after the operation on the 13th, and the evident expression of satisfaction with her condition after that operation, as stated by Dr. Pancoast; the encouragement given to her, as shown by the testimony of her sister, and of the incident of the shoes, and her father's statement to her, testified to by Mrs. Magee, " that when she got well she and Mrs. Magee would be cronies," and of her rapid progress and strength in taking nourishment, all show the physical symptoms to have been such as to evidently impress themselves upon her mind in such a manner as to produce irresistibly an impression amounting to a strong hope and a uniformly express desire that she might recover.

It wants to be remembered in disposing of this exception that the declarations were made six days after the shooting. The books do not contain parallel cases to this, because in every case the declaration that has been admitted has been made within a very short time of the inflicting of the injury, as in the Donnelly case, and has amounted almost to a part of the *res gestæ.* The very continuance of life for six days carried with it an impression of hope.

At the beginning, when death must have seemed absolutely sure, she had answered her mother, when asked who shot her : " I can't tell ;" and had replied to her father's statement, " this is bad : " " I know it, but I could not help it," and that she " fell down the hay-mow."

Dying declarations should be held as closely as possible to statements made just at or after the occurrence. The longer the time after the shooting the more strict should be the rule as to their admission. It gives time for revenge, or self-shielding, or any other motive to have sway in the mind of the declarant, and robs it of the essence of such a declaration, which is the voluntary act and spontaneous impulse of a person in the immediate fear of death, which casts upon them a solemnity equal to an oath, by the expectation, in the sight

and from the effect of the terrible injury just inflicted, of being brought immediately into the presence of their Maker.

Dying declarations must be literally what the name implies —something declared and pronounced by the declarant of his or her own motion. In *Commonwealth* v. *Casey*, 11 *Cush.* 417 (421), Shaw, C. J., declares that after all the preliminary facts were found that would justify a declaration being admitted, the declaration must be shown to have been freely and voluntarily made, and without coercion, or they were not competent evidence to go to the jury. They cannot be, legally, declarations when drawn from a witness. Green, C. J., in the Donnelly case, treats of this element (2 *Dutcher* 499); also Chancellor Williamson, in the same case (*p.* 632), where he refers to a confession and its admission, and a degree of freedom necessary thereto. The same rule applies to declarations.

The court must also be satisfied that the statement made by the declarant is complete, and not only what the questioner may want. The declarant should be asked for the whole transaction; not only for the truth, but the whole truth; the facts, not conclusions; what the prisoner did. 1 *Taylor on Ev.* 631, §§ 716–721; *Jackson* v. *Commonwealth*, 19 *Gratt.* 668.

### AS TO EXCEPTION NUMBER SEVEN.

On this exception the "seventh," "eighth," "ninth," "tenth" and "eleventh" assignments of error are founded. The ruling of the court is of such a character that it is entitled to be called an "*omnibus*" decision. The court did not rule upon each case as it was presented, and upon each particular time or occurrence, but takes them all up and says, "Go on; tell all about declarations made at each of these times." Some of these occurrences stood on different statements from the others. In time, they differed in the period from the alleged shooting, and the declarant at each was in different states of physical condition. In expression she modifies her

words which she uses to convey her impressions as to her re-covery. It is quite clear that dying declarations cannot be admitted in evidence by the wholesale. Each transaction must stand alone—each occurrence must be dealt with and admitted or excluded separately.

The first dying declaration that was admitted under this ruling is found in Assignment No. 7, and relates to Friday morning, February 11th, 1887. On that morning her mother, Joanna W. Anderson, testified she appeared a great deal better. This was the day she recognized Aunt Mary Jane, and called her by name. This is the morning Dr. Brown says that she recognized him, and he noticed her improvement.

It is absolutely impossible to see upon what principle the court could have admitted the declaration to Dr. Wile. It is preceded by no statement of the declarant whatever, as to her physical condition, hope of life, or any of the facts necessary to warrant its admission ; nor is there any testimony of this witness that he heard her so state to any other person. It is perfectly clear that this exception is good. Joanna W. Ander-son testifies that Kittie said "she thought she would never get well, but she wanted to get well." Samuel Carr, a constable, testifies that Kittie said, " I don't think I shall live long ; " and he further says she said several times that she " could not get well." This was the only occasion he had then been there. Mr. Carr, on cross-examination, shows that what he states her as saying on the direct, was put into her mouth by questions, and that she simply nodded her head in answer.

They appear to have been tormenting this girl from day to day. They have carefully covered it up as much as they could do so, but the fact remains, and stands out all through the evidence, that they earnestly tried to convince the girl that she thought she was about to die, and that she must tell who did it, and the great effort of these people seems to have been to get her to say it was " Bart."

On Wednesday, 16th, she was asked if she expected to get well, and replied, " No, I can't ; " but said she would like to get well.

Eva, her sister, said to her then, " If you think you will never get well you ought to tell," and she replied, " I cannot get well."

William Anderson testifies that on the night of Saturday after the shooting Kittie said, " I never expect to get well of this wound."

This witness says, as to the incident of the shoes, Kittie had one of them in her hands, and he said to her, " When you get well I will get you a pair like them ; " and she replied, " Yes, but I will never get well."

On these state of facts, as to the condition of the declarant, and as to her impression of almost immediate dissolution, the state made the following offer :

" We now offer to prove the declarations made by the deceased at the several times above alluded to in the testimony, during her sickness, to her family and others, as dying declarations as to the circumstances of the shooting and who shot her."

This offer is of a most astounding character. Can it be possible that dying declarations can be admitted in this way ?

This mode of ruling gave to the jury the impression that they had the right to consider everything said by the deceased at any time during her sickness, to any member of the family or other persons, as evidence in the cause, and to treat them as declarations of equal force as if made under the sanctity of an oath. Go over this evidence very carefully from page 1 to page 480 of case, and there are statements made there to some of the witnesses which were admitted as dying declarations, under circumstances that will not find a parallel in any reported case or text book.

A declaration made to-day might be made under a very different impression from the one made to-morrow or next day. The statements made by the declarant at each time, in the printed case, vary more or less. It is absolutely safe to say that she never made a stronger statement than " I cannot recover," and every one of which is coupled with the statement : " But I want to get well." No doctor ever said to her

at any point of time in this testimony : "You cannot get well, Kittie; you must prepare to die;" or, "It is impossible for you to get well." No Christian consolation by priest or minister seems ever to have been suggested; and I contend that there is no point in the case at which it is clearly proven that Kittie ever said she was without hope, or, when making a declaration, that she clearly had an abiding impression of almost immediate dissolution.

It must not be a transitory impression under such a ruling as the one we are considering. The time covered by the ruling is weeks. It covers alleged statements—February 11th, 13th, 16th, 20th, 24th, if not others. It would seem that to sustain such a ruling, that the abiding impressions should be shown to be firmly, hopelessly fixed in her mind during the whole time. She was better on the 11th ; much better on the 13th —so much so that Dr. Pancoast says: "He limited himself."

It is an astounding proposition, under the evidence in this cause, to declare that the declarant, from the 11th to the 24th of February, was under an abiding impression of speedy death. The reverse of that statement is true.

The exception should be sustained, for two reasons :

First. Because it relates to a number of occurrences at different dates and times, and is not directed to any particular dying declaration, and therefore is improper and illegal, as each must stand on its own particular circumstances.

Second. Because the evidence does not show, during the whole period covered by the court's ruling, such an abiding impression of speedy death as to warrant the court in saying that any declaration made at any time, from February 11th to February 24th, was made under such conditions as, at law, will make them amount to dying declarations.

### SUGGESTIONS.

There is one other suggestion for the court in disposing of these exceptions. Can the court see that the declarations of Kittie Anderson were freely and voluntarily made, and without coercion ?

Dr. Pancoast says it was said: "We ought to try and get a statement out of her about the man that did this thing, or who did it."

She did not talk freely, but had to be urged, as a matter of duty, before she talked (Pancoast). Her mother urged her to talk and tell, with all the hope she had of heaven. Her sister Eva wanted to name five young men of her acquaintance to get her to tell which one did it. Such a declaration must be absolutely free and voluntary. It cannot be extorted from the injured one and be a declaration in legal acceptation. It is a dying declaration, not a dying extortion, that is admissible in evidence.

Again, the statement of the declarant should be a complete one, not what the questioner wants. The declarant never appears to have been asked for the transaction—the whole occurrence. The people appear to have required her to tell just what they wanted, and asked for no more. The whole particulars should have been asked. How came she at the end of the lane that night? How did Peak know she was to be there? Was it by pre-arrangement? Was there a quarrel? Did they talk together? How did the shooting occur? If she knew what she said, she knew more. The declaration should not be admitted unless it was apparently a complete statement. It does not even appear that these searchers after truth attempted to extract from the witness any of these facts.

### CONCLUSION.

As a whole this is a strange case. The defendant stands denying the shooting. There are no circumstances justifying his conviction on the case, as the innocence is always presumed in every act or statement of an accused in a murder case; where any possible construction contrary to guilt can be given to them, it is required to be given. *State* v. *Bennett*, 12 *Vroom* 370.

. The revolver being in Kittie's hands is fully and fairly accounted for. The case of the state stands on the dying

declarations of the girl, not one of which was made until four days after the shooting, although she was sensible on the day after, and told her mother, when asked, "Who hurt you?" "Can't tell," and that "She fell down the hay-mow." In a short time afterwards, on the same day, to her father, when he said: "Kittie, this is bad," she replied: "I know, papa, but I could not help it." She did not then accuse Peak. Then was the time to speak. Then dying déclarations would have been worth something.

But this is not all. After her mother saw her stricken and in bed, and before her father did, Barclay W. Peak appears on the scene, goes at once to her bedside, stoops over and kisses her, and says: "Kittie, who hurt you?" She saw him. He remained about the house. He repeated his caresses. She talked to others. Did she accuse him? Did she repulse him? Her mother testifies that she not only did not so do, but that she returned his kisses. She further says he sat with her several times and held her hand. He slept in the room, on the sofa, the first night. He sent for the doctor. Is there a single act of his like a guilty man? Did the girl so treat him? How carefully these declarations should be weighed. Her mother, her father, her sister, her doctor—all besought her to tell who did it. Had revenge come in? Had fear to tell the truth taken possession of her? Had she, when she said "Bart," not reached a place of fear to own that she had done the deed herself? Why did not the state take Barclay to her bedside, and ask her if he did it? The course of the state in this case has not only been unfair, but deceptive and coercive. Constables, coroners and the prosecutor, in great array, daily sought this poor girl; in fear she must tell something. Shall she accuse herself? Did the state treat the defendant fairly?

Lord Denman, in the *Sussex Peerage,* 11 *Cl. & Fin.* 108 (112), declares that "dying declarations should always be received with caution, as they are not subject to cross-examination"; and when it appears that the declarations were extracted from the declarant by questions, and are evidently not complete and the whole truth, how much greater should be that caution?

The life of a human being hangs in the balance. He is innocent until proven guilty. Can this court say that under the evidence the declarations convicting him are not of vital importance, and shall they be admitted irregularly, informally and, as I think, illegally, by wholesale? Such is this case. I respectfully submit the case of the prisoner to the careful consideration of the court, confident that investigation and research will but strengthen the positions here presented, and establish the illegality of the evidence admitted at the trial, and bring to the prisoner an award of a new trial. As I look at this case, nothing less than this will be justice.

For the state, *Charles E. Hendrickson, Prosecutor of the Pleas.*

The assignments of error, from No. 5 to No. 11, inclusive, are based on exceptions to the admission as dying declarations of the *ante mortem* statements of Katie Anderson, with reference to the circumstances of the shooting; and No. 12 is based on an exception to the court's refusal, at the close of the state's case, to strike out the evidence of those statements as not shown to have been made *in extremis*, as fragmentary and incompetent evidence.

For the purpose of this argument, these assignments of error may be conveniently considered together. They cover six distinct statements which were offered as dying declarations.

1. The first, made on Friday morning, February 11th, 1887, in the presence and hearing of Dr. R. E. Brown, Eva D. Anderson and Mary Jane Peak.

2. The second statement was made on the afternoon of the same day, in the presence and hearing of Justice John T. Naylor, Eva D. Anderson, Samuel Carr, constable, and the prosecutor of the pleas.

3. The third statement, in the order of time, was made about three o'clock in the morning of the 12th of February, in the presence of William Anderson, the father.

4. Statement number four was made by the deceased on

Sunday, the 13th of February, in the presence of Dr. William H. Pancoast and Dr. William C. Wile.

5. Statement number five was made on Wednesday, February 16th, in the presence of Eva D. Anderson, Joanna Anderson, Dr. Brown, Alonzo M. Bodine and Samuel Cart.

6. The sixth and last of the statements was made by Katie Anderson to her mother, Joanna Anderson, in the latter part of the same week as the last preceding statement, and not later than February 19th.

Having referred to the principal citations of evidence showing what the declarations of the decedent were, to which exception has been taken, both upon her expectation of recovery at the time and the circumstances of the shooting, I remark, as to the law governing the admission of such testimony, that the following are well-settled principles which have been affirmed and settled by adjudication in the highest courts in New Jersey and elsewhere.

1. That it is essential to the admissibility of dying declarations, and it is a preliminary fact to be proved by the party offering them, that they were made under a sense of impending death ; that the party making them had at the time an abiding impression of almost immediate dissolution ; but that it is this impression upon the mind, and not the fact of the quick succession of death after the declarations, that makes the testimony admissible before a jury.

*Donnelly* v. *State.* Opinion by Chief Justice Green, in the Supreme Court, 2 *Dutcher* 463, and cases there cited ; also, the same case upon review by the Court of Errors and Appeals of this state. Opinion by Judge Ogden, 2 *Dutcher* 601. Citation from page 618.

2. That for proof of that state of mind and consciousness in the declarant, the court may look—

(1) To the nature of the injury.

(2) To the extent of the wound.

(3) To the condition of the declarant.

(4) To the notice (if any) given by physicians to him that certain dissolution will follow from the injury.

(5) To his own expressions of his sense of peril and such other facts and circumstances as naturally would tend to show whether he had an *abiding* impression of almost immediate dissolution.    *Donnelly* v. *State*, 2 *Dutcher* 618.

3. That while what constitutes a dying declaration is a question of law and the proper subject of review upon a writ of error, yet that the appellate court, in dealing with this question, will regard the decision of the court below upon the credibility of the testimony in support of this preliminary issue as final, and will give to each fact sworn to its appropriate effect without questioning its credibility.    *Donnelly* v. *State*, 2 *Dutcher* 498.

4. That even if it should appear that the court below admitted such declarations in evidence before it had been satisfactorily proved that the declarant was, at the time of making the same, under a sense of impending death, yet, if in the progress of the trial that fact was subsequently established by satisfactory proof, there would be no ground for reversal. *Same* v. *Same*, 2 *Dutcher* 502.

With these well-settled propositions of law to guide us, let us see if any error was committed by the court below in this case in admitting the above evidence of Katie Anderson's *ante mortem* statements.

And pursuing the above subdivisions of the various sources of proof to which the court may look, let us ask what was the nature of the injury and the extent of the wound?

It was a pistol-shot wound in the left temple, the pistol ball crushing through the skull and perforating through the left lobe of the brain, the falx, or shelf membrane, and into the right lobe, and the injury thus caused was exceedingly dangerous to life.

Dr. Brown says: "We consider those having such wounds in a very serious or critical condition."

Dr. Franklin Gauntt says that gun or pistol-shot wounds are usually considered fatal, and when the brain is perforated especially fatal, but there are many exceptions to that rule.

Dr. William H. Pancoast says: "Generally and publicly,

gentlemen, intelligent people consider and know that generally a pistol bullet in the brain means death; generally, it is followed by death."

And is not that true? Is it not a fact that although physicians and surgeons read and know of exceptional instances of recovery through the encysting of the ball, that to the popular mind the bullet in the brain means death?

But again, was her physical condition from the effects of her wound such as would be likely to impress her that death would speedily follow therefrom?

Is it not in evidence that up to and including the times when these several declarations were made by her after her restoration to consciousness, that she lay prostrate upon her bed, unable to turn herself or sit up in bed, but had to be turned and lifted by her attendants?

The evidence further shows that Katie Anderson never sat up without assistance, after her wound, and was never sitting up out of bed but on one or two occasions, when with assistance she did so while the bed was being changed, and even that did not occur until after the time of these declarations in question.

Evidence on this point might be multiplied, but enough appears to show that at those times, when she made her statements, Katie Anderson was suffering great bodily weakness, and that limp and helpless as she lay in the arms of her sister, the short conversations would exhaust her so that physicians and attendants felt impelled to yield at once to her desire for rest.

Is not such a condition of bodily weakness, arising from such a pistol-shot wound in the brain, calculated to impress the sufferer with a sense of impending death?

But in the further review of the sources of proof upon this question, to which the court must have looked in determining the admissibility of the *ante mortem* statements objected to, we ask another question, What notice was given to Katie Anderson by her physicians that she could not recover from her wounds, and as to the nearness of her death?

Dr. Brown says that preliminary to the statement of the 11th of February, in the morning, he spoke to Katie, and told her that in her condition of impending death she ought to make a statement as to how she came by that wound. He told her she was liable to die at any moment, and that she was looking right at him at the time. Again, before her statement on the 16th, he says: "I told her she was in a critical condition and one of impending death; that she should tell everything she could."

At this same interview of the 16th, Mrs. Anderson testifies that she told Katie that the doctor said that she was liable to die at any moment, and that she said: "Katie, you must tell us who shot you; it would be terrible for you to die without telling, as you could have no hope of heaven if you should die and let an innocent party suffer for the crime."

Dr. Pancoast says that preliminary to her statement, made to him and Dr. Wile on Sunday, February 13th, he told Katie her injuries were very serious, and said that her life was always in danger; not to discourage or cheer her up. He says: "I told her family from the first that she had very slight hopes." And further on, he says he told the poor girl beforehand that she was in danger of dying; that he was going to perform an operation which was very serious, and that she might possibly die; that she could not recover, although she would, he believed, survive the operation; yet, still she must recognize she was to undergo an operation which would endanger her life, and that if she had anything to say it was time to speak.

Here, then, is the testimony of the family physician that he several times notified Katie Anderson, and always preceding the statements in question, that she was in a condition of impending death, and that she was liable to die at any moment; and added to this were the solemn words of Dr. Pancoast that her life was always in danger; that she could not recover; and that she might die in the operation which was about to be undertaken upon her. Was it likely to impress her with a sense of impending death?

But·what was her mind on this important subject, and how was she impressed, from these various sources of suggestion that we have noticed, as to her prospect of recovery or early dissolution ?

The facts and circumstances above detailed would seem to be enough to justify the conclusion of the court below in this matter ; for we must bear in mind that the law is (as laid down by Chief Justice Green in the case of *Donnelly* v. *State*, 2 *Dutcher* 500) that " it is not necessary that the party injured should state, at the time of making the declarations, that they were made under a sense of impending death ; it is enough if it satisfactorily appears in any mode that they were made under that sanction."

It is, however, a satisfaction to learn from the conversations and conduct of Katie Anderson, while upon what proved to be her death bed, that what the court might reasonably have expected would be the effect of her situation and surroundings, and the solemn warnings of her attending physicians, in impressing her with a sense of approaching dissolution, was so in fact, unmistakably.

Did Katie ever express any hope of recovery? Dr. Brown visited her two and three times a day from the time she was shot until her death ; but he testifies that he never, on any of his visits, heard Katie express any hope of recovery from this sickness. Dr. Pancoast also testifies that he never heard Katie express a hope to get well from this sickness.

I have noticed that it is not uncommon, in cases of fatal illness or injury, that before physicians and attendants have lost hope, the patient has seemed mysteriously impressed that he was going to die. And such seems to have been the case with Katie Anderson. Just whence or how this solemn impression comes we cannot tell, we need not know, but it would seem as though there are times when. for some wise purpose of His own, the Omniscient One thus warns the fateful sufferer of approaching dissolution. And with such an accumulation of evidence, from the various sources above pointed out, establishing clearly and unmistakably that Katie Ander-

son was under a sense of impending death at the time of these ante mortem statements as to the homicidal act, it seems to me impossible for this court to say that the court below committed error in their admission as dying declarations.

It may be suggested by the other side in this argument, as it was in the court below, that because Katie Anderson, when thus expressing herself as having no hope or expectation of recovery, did several times, when asked if she would like to get well or wanted to get well, reply in the affirmative and thereby give an intimation that she was not entirely without hope in that respect; but does the language bear out such an inference, especially, since on every occasion of its use, she also remarked that she couldn't get well or that she could never get well? Such language has, indeed, a meaning, and it shows that Katie Anderson, though conscious of her approaching end, had no desire to die, and it was thus a powerful rebuttal to the theory of suicide advanced by the defence.

And it may be further suggested by the other side that it must appear that the declarant was under a sense of almost immediate dissolution, in order to admit such statements as dying declarations, and that it does not clearly appear that Katie Anderson was so impressed at the times and on the occasions under investigation. And that the fact that she survived a considerable time afterward should have weight with the court in favor of excluding these declarations.

But I submit that under the legal and proper construction of the terms, sense of impending death or of almost immediate dissolution, the evidence shows that Katie Anderson, in those particulars, came fully up to the required test.

Upon this point, Dr, Wharton, in his Criminal Evidence (8th ed.), § 282, says: "But it is not necessary to prove expressions implying apprehension of immediate danger, if it be clear that the party does not expect to survive the injury," and cites a large number of cases in support of the doctrine.

In further answer to the above suggestions of the defence, and as illustrative of what expressions have been held to be indicative of a sense of impending death, and that this prin-

ciple is not affected by the length of time the party may sur-
vive after the declarations have been made; I further cite
from Wharton's Criminal Evidence, ¶ 283 : " Hence in a
case before the twelve English judges on a case reserved, it
was held that the declarations of the deceased, made on the
day he was wounded, and when he believed he should not
recover, were evidence, although he did not die till eleven
days after, and although the surgeon did not think his case
hopeless, and continued to tell him so till the day of his
death." And also from paragraph 284 : " Where the party,
being confined to his bed, said to his surgeon : ' I am afraid,
doctor, I shall never recover ; ' and where the surgeon having
said : ' You are in great danger,' the party replied : ' I fear I
am,' declarations subsequently made were admitted."

Again, from paragraph 284 : "A statement concluded with
these words : ' I have made this statement believing I shall
not recover.' At the time it was made the deceased was in
such a state that his death seemed imminent, and he died
seven days afterward. But it appeared also, that shortly be-
fore he made the declaration he had said to a constable, who
asked him how he was : ' I have seen Mr. Booker, the sur-
geon, to-day, and he has given me some little hope that I am
better ; but I do not myself think I shall *ultimately* recover.'
Afterwards, on the same occasion, he said he could not re-
cover. It was held that there was sufficient evidence that
the statement was made under a consciousness of impending
death to justify its reception in evidence."

In the case of *Kelly* v. *United States*, on indictment for man-
slaughter, in the United States Circuit Court, District of Maine,
reported in 8 *Crim. L. Mag.* 171, the facts were that the de-
ceased stated, at or about the time the statement was taken
down in writing : " It is of no use ; I am almost gone ; " or
" Oh dear ! have I got to talk ? I am almost gone." Dr.
Furgueson testified that the morning Smith was shot, and
when he was lying on the veranda of Mrs. Haley's house, he
said to Mr. Perkins : " I think he cannot live ; " and that

in saying those words Smith opened his eyes and looked up at him, evidently understanding what was said.

Judge Colt, after reviewing these facts, says: "It seems to us that the evidence brings the statement of Smith within the rule as to dying declarations, and that it was properly admissible as such."

In the case of *State* v. *Johnson,* determined in the Supreme Court of South Carolina, as late as February 19th, 1887, and reported in 9 *Crim. L. Mag.* 451, which was a case of homicide by shooting, the circumstances were that the declarant was in a very low condition; the declarations began with the question: "Do you think you will ever get well, or do you think it will kill you?" To which the answer was: "I don't know; I don't think I will ever get well; the doctor don't tell me much."

Upon this the court says: "It seems to us that this question and answer were quite sufficient to show that the deceased had no hope of recovery at the time, even when considered apart from the surrounding circumstances; but when looked at in the light of those circumstances we think it clear that all the requirements of the rule are fully met." The court adds: "This case, as it seems to us, is a stronger case than that of State *v.* Nance, recently decided, and not yet reported, in which the declarations were held competent; and that case fully supports the conclusion reached here."

In the valuable notes to that case added by the editor, on page 462 of the magazine, we find the following: "It may be laid down as a general rule that a considerable length of time between the making of a statement and the time of death does not render the statement inadmissible." And following this are cited numerous cases where two weeks, seventeen days, and three weeks, have elapsed between the time of the declarations and death.

It must be apparent that in contrast with the cases above cited, the proof of a sense of impending death in that of Katie Anderson was by far the strongest and most convincing, and certainly it ought not to lose anything by the fact that because

of her superior bodily strength and vigor she was able to maintain her hold on life a little longer than the average in such cases, and beyond the expectations of her attending physicians.

It remains to notice, in this connection, the twelfth assignment of error upon the court's refusal to strike out part or all of said declarations as "fragmentary, incomplete statements of mere conclusions, and not facts, and were not shown to have been made *in extremis.*"

But these objections will not lie, because not made at the time of the admission of the testimony, except on the point that they were not made *in extremis,* which was disposed of above under other assignments of error. As no objection to the testimony on this ground was made at the time of its admission, a bill of exceptions will not lie to a refusal to strike out the evidence.

The proper course, in such cases, was to ask the court below to charge that it be disregarded. *Oswald* v. *Kennedy,* 48 *Penna. St.* 9.

Besides, this assignment set forth grounds of error not contained in the bill of exceptions, and cannot be noticed in this court. *Donnelly* v. *State,* 2 *Dutcher* 511 ; *Stew. Dig., p.* 466, § 119.

But even upon the merits, such an exception is not tenable, for these declarations are not fragmentary and incomplete, in a legal sense, nor are they mere conclusions.

Now, the rule as to when declarations are objectionable as fragmentary is laid down, in Wharton's Criminal Evidence, to be where it be shown that the declarations were uttered by the dying man, to be connected with and qualified by other statements, and before the purposed disclosure was fully made they had been interrupted and the narrative left unfinished ; and the author adds : "But if it appear that the deceased stated all he desired to say, the fact that the narrative of what occurred is not complete does not render the declaration incompetent."

It needs but to state this principle of law, in connection

with the facts as to the declarations, to satisfy every one that the declarations were complete in themselves, and not fragmentary in the legal sense.

And are her declarations, such as—"Bart Peak shot me at the end of the lane," or that " he watched and shot me," either fragmentary or objectionable as expressing an opinion or conclusion merely, and not facts.

I insist they are not, and refer to the following authorities to support this view of the matter.

In note 3 to 1 *Greenl. on Evidence*, § 159, a case is cited as follows: " Where the deceased being asked who shot him replied, ' The prisoner,' *the declaration is complete* and cannot be rejected because, from weakness or exhaustion, he was unable to answer another question propounded to him immediately afterward." *McLean* v. *State*, 16 *Ala.* 672.

I also refer to *Whart. on Criminal Evidence*, § 294, and cases cited. Also to the case of *Walker* v. *State*, 39 *Ark.* 221, which was determined in 1883, and where it was held that a dying declaration that " A B shot me," was a statement of fact and not of opinion, and therefore admissible, although the shot was fired through an auger hole in the door.

So, in *Jordan* v. *State*, 2 *South. Rep.* 460, (*Am. Dig.* 1887, No. 7, page 78), declarations of deceased, " J. shot me and H. cut me, and all for nothing," were properly admitted ; also, in *State* v. *Saunders*, 12 *Pac. Rep.* 441, (*Am. Dig.* 1887, No. 1, page 65), the statement of deceased, " He shot me like a dog," is descriptive of the manner of the killing, and not inadmissible as a conclusion of the deceased.

These dying declarations of Katie Anderson are short, and may lack somewhat in detail because they were made by her in great weakness, and when her examination was not further prolonged by reason of her exhaustion, when to press her further would have added to her suffering and further imperiled her life at times, when all of her attendants and friends were so anxious for her recovery, but clearly they are not objectionable as being fragmentary and conclusions or opinions, and not facts.

II. In this second division of my argument, I shall embrace the remaining assignments of error.

Assignment one is based on the refusal of the court to quash the panel of jurors, because, as alleged, the certified list of jurors filed in the clerk's office did not contain a complete list of said jurors, as required by the statute.

The challenge to the array, to the overruling of which this exception was taken, admits that sixty names were drawn and selected by the sheriff and judges to constitute the panel of jurors to serve at the April Term of the Courts of Oyer and Terminer, in Burlington county, but alleges that the list of said jurors certified under the hand of the sheriff, and also certified by the judges, &c., and filed in the clerk's office, did not contain a complete list of the names so drawn and selected, as required by the statute, but, on the contrary, contained the names of only twelve persons, &c.

The contrary of said allegations is true. The list in question contained the sixty names as drawn, forty-eight of them being together, and the other twelve after an interval of some unused blanks, but the whole of the names regularly numbered from one to sixty.

The confusion in the list, as it might strike the reader at first sight, occurs by the failure of the clerk to strike out the unused printed blanks occurring between the two parts of the list of sixty names.

By a glance at the book of these certificates of the jury lists, kept by the clerk, the court can readily see that the whole constitutes but one certified list and that it includes the sixty names.

That shows that there is the full printed form of the drawing and certifying a list of jurors for a term of court, with blank for just forty-eight names on each page, and the court having, for the first time in many years, ordered sixty to be drawn, the clerk wrote in the blank as they were drawn until it was filled by the forty-eight names, and turned over, using the blank on the next page for the remaining twelve, and using the blank under that for the certificates of the

sheriff and judges, and forgetting to strike out the unused blank printed certificates and beginning remaining between the two parts of said list of names.

The whole certificate, in its beginning and ending parts, is perfect and complete, and is properly signed and certified to at the end by the sheriff and judges, and the harmless surplusage of printed matter separating the list of names into two parts cannot render the list uncertain or invalidate it.

The next assignment of error, being the second, is based on an exception equally frivolous and untenable.

The substance of the exception is to the ruling of the court in refusing to set aside the list of forty-eight jurymen served upon the defendant two days before the trial, because said list was not obtained by drawing them from a box out of the full panel, in the same way that jurors are drawn for the trial of causes, the defence insisting that such is the requirement of the act of 1881. *Pamph. L., p.* 49. The language of the act in question is : "That in cases requiring a list of the jury to be served on the defendant, the names of the jurors so served shall be placed in and drawn from the jury box in the ordinary way."

Nothing can be plainer than the fact that this act in no way applies to drawing from the box the names to be served on the defendant, but to the drawing of a jury for a trial of the cause from the list so served on the defendant. The sheriff is required to select the forty-eight names to be served on the defendant, and the practice is not changed by the above act. There can be no error in the court's so ruling in this matter.

The third and fourth assignments of error are based on exceptions to the rulings of the court in permitting Eva D. Anderson and Joanna W. Anderson to testify as to what Dr. Brown and others said to Katie Anderson, the deceased, concerning the dangerous character of her wound and her liability to die at any moment.

The exception on page 185 embodies the position of the defence in this matter, and is as follows : " The defendant

objects to that part of the statement of the witness as to what
Dr. Brown said to Katie Anderson, also, to the form of the
proof, upon the ground that such evidence is mere hearsay,
unless proven by Dr. Brown himself."

The authorities are clear and uncontradicted that in the pre-
liminary proof necessary for the admission of dying declara-
tions the declarant was, at the time, under a sense of impend-
ing death. Evidence of the opinions of the physician or
other attendants, stated to the declarant as to his condition
and prospects of recovery, is always admissible. *Donnelly*
v. *State*, 2 *Dutcher* 499, 618; 1 *Greenl. Ev.*, § 158.

This doctrine does not in fact seem to be questioned by the
defence, for they have not objected to the evidence of Dr.
Brown and Dr. Pancoast upon those points, but their insist-
ment seems to be that the persons who were present and heard
the doctors make such statements to the declarant should not
be permitted to testify to what they heard, in corroboration of
the physicians. They term such evidence hearsay, and hence
not admissible.

Hearsay evidence is that obtained from a witness who does
not speak of facts or declarations from his own personal
knowledge, but from information received through a third
person. 1 *Greenl. Ev.*, § 98.

Such is not the case with the evidence of Miss Eva D. An-
derson and her mother, in question. Their testimony is from
what they themselves heard the physicians and others say to
Katie touching her condition and liability to die speedily from
the wound. There is clearly nothing in this alleged error.

The next assignment of error to be noticed is the thirteenth,
based on an exception to the court's refusing to admit the
testimony of Edward Emley, sheriff, as to the amounts of
money he had paid to the expert witnesses for the state.

The court did not permit proof, however, to the extent
that they received more than the usual legal fees.

There was no offer to prove that the amount of their fees
had been fixed or agreed upon before they had testified, or
that any such inducement had been offered to procure their

testimony, and in the absence of such offer, the court has a right to presume there were no fees agreed upon beforehand, inasmuch as nothing can be paid to experts by the county, except such an amount as the presiding judge at the trial shall approve as reasonable and proper.

It is held in the case of *Lindabury* v. *Freeholders of Ocean*, 18 *Vroom* 417, that under section 100 of the Criminal Procedure act, the presiding judge's certificate of approval as to expenses incurred thereunder in the prosecution of indictments is conclusive both as to the necessity of such expenses and the sum to be paid.

A payment of fees to expert witnesses by the county, where the amount is fixed with and under the approval of the presiding judge, pursuant to the statute, cannot certainly be regarded as in law affecting the fairness and impartiality of the witness, and inquirable into on the trial as showing his interest or bias.

Even in private or civil causes, where the compensation to experts has been paid by one of the parties, it has been held to be immaterial as a matter of testimony.

In *Lawson on Expert and Opinion Evidence* 270, I find the following rule laid down, to wit: "The fact that a medical expert attended a trial and testified at the instance of one party for a considerable compensation, which was unknown to the other party until after the testimony was closed, does not affect the verdict."

But even if there had been error in the admission of this testimony, it could not be ground for reversal under the statute cited above, because the material facts in this case testified to by the state's experts are likewise testified to substantially by the defendant's expert witnesses.

The next assignment of error to be noticed is the fourteenth, which is based on exceptions to the admission of certain rebuttal testimony offered by the state.

In support of a theory of attempted suicide, the defence brought out the following evidence from Rebecca Peak, the mother of the defendant: She says that on the Thursday

week before Christmas she asked Katie Anderson if she would not come and take Christmas dinner with them; that Katie's reply was: "I will come if I am living; if I hain't, I will make the devil a good Christmas dinner." The witness further said that "somewheres about a week" previous to the Sunday before Katie was shot, she noticed Katie seemed to be worried about something; did not seem to be like she had been in time back; she'd be sitting around and heaving long sighs; that she asked her what ailed her, and she made answer: "Nothing at all." On her cross-examination, the witness said on that Thursday week before Christmas, she could see a difference in Katie's countenance, and she spoke shorter about things, as if she was not very well pleased; spoke shorter than she did usually.

Amanda Peak, a sister of defendant, had also testified for the defence that on the Sunday before the shooting, Katie said her head run around so she could not stand up; that she felt like a drunken man; that she was going to take Paris green to get out of her senses, and other evidence having a tendency to show that Katie was worried and wanted to commit suicide.

During the time covered by this testimony of the Peaks, Katie Anderson was living and working at Colkitt's, and was only a visitor at Peak's on parts of days once or twice a week.

It became, therefore, pertinent to show in rebuttal, by Mr. Stratton Colkitt, that at the times and during the periods above named, the deceased showed no change in her usual conduct and demeanor; that she exhibited her usual cheerfulness.

It is to this testimony that the exception now under consideration was taken. The trial judge ruled that the evidence would be rebutting to what Mrs. Peak said if brought within the proper time; and the court confined the evidence on that point thereafter to the times above indicated, and to the admission of other evidence on the same point thereafter the defence took no exception.

Besides, the admission of this evidence was clearly a matter in the discretion of the court and not assignable for error. The objection in this case is not to the competency of the evidence, but to the time of offering it, the language of the objection being that it was a part of the state's case in the opening, and was merely cumulative of the state's original case. The conduct of the trial and the general course of the examination of witnesses rests very much in the discretion of the judge, and does not constitute a ground of error. *Donnelly* v. *State*, 2 *Dutcher* 496–610.

Whether evidence is rebutting or in chief is held to be a matter within the discretion of the court below, and consequently not reviewable on error. *Johnston* v. *Jones*, 1 *Black* 209.

The only remaining assignments of error to be discussed are the fifteenth and sixteenth, which are based on exceptions to portions of the judge's charge, recited in the assignments of error, and also in the exceptions.

The exceptions here mentioned do not make mention of any point or ground wherein the portions of the charge are erroneous.

They are general, and may be disregarded by the appellate court. *Oliver* v. *Phelps*, 1 *Zab.* 597; *Spenc.* 180; *Associates, &c.,* v. *Davison*, 5 *Dutcher* 415–418; *Allaire* v. *Allaire*, 10 *Vroom* 113; 14 *Vroom* 260.

But the insistment in the assignments of error is that the court misstated the evidence, and stated as established facts matters not conclusively proven by the evidence in the cause. But such insistment is entirely untenable.

And in closing this argument and reply to the matters assigned for error and alleged to have occurred on the trial of this indictment, I deem it but just to call attention to the fact that there were so few exceptions taken on a trial so prolonged, and in a capital case so important as evidence of the great ability and fidelity with which the eminent justice who presided at this trial discharged his delicate and responsible duties.

You will note that wherever the offer on the part of the state was the least doubtful, the doubt was resolved in favor of the defendant by overruling the testimony.

A review of the charge, to which two slight exceptions were taken, will show that taken as a whole, while it is marked by a firm and fearless discussion of the character of the evidence and the principles of law to be applied thereto, that it commends with great fairness the evidence on the part of the defendant to the careful and favorable consideration of the jury, taking care to define the nature of a reasonable doubt, and to instruct the jury that it must in all things be resolved, where it exists, in favor of the defendant.

It must be noticed that the twenty requests to charge presented to the court by the counsel for the defendant, and in his favor, were charged by the court in the language requested.

And yet, with all these guards so mercifully provided by the law, and so carefully enjoined in this case by the court for the protection of the accused, he was found guilty by a jury of his peers of the willful and deliberate murder of Mary Catherine Anderson, a pure, innocent and unoffending girl, under circumstances of great cruelty and atrocity.

I feel compelled, by a sense of duty as well as of right, to ask this honorable court that the judgment of death pronounced by the law in the court below against the prisoner shall be affirmed.

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE.  Barclay W. Peak was convicted before the Oyer and Terminer of the county of Burlington of the willful murder of Mary Catharine Anderson.

The case is before this court on error, so that the only question to which we are at present called upon to respond is whether the proceedings ensuing in a conviction are in conformity with the laws of this state.  It appears from the bills of exception that the judicial conduct of the trial was in many respects put in question, but it will be sufficient to dis-

cuss and decide those objections that were principally relied upon by the counsel of the defendant in their arguments before us.

The objection first urged was that the court below erred in overruling the challenge to the array of the panel of jurors, which was interposed in behalf of the defendant.

The record shows that sixty persons were duly selected in Burlington county to constitute the general panel of jurors for the term at which this case was tried, and this challenge stated as its ground "that the list of the names of the persons selected and drawn by the sheriff of the said county of Burlington to serve as jurymen at the said April Term of said court, and certified by the Court of Common Pleas and duly filed in the clerk's office, was not a complete list of the names of the persons so drawn and selected, but, on the contrary, contained the names of only twelve persons."

But we do not find this objection to be sustained by the facts before us. Upon inspection we think that the entire sixty names were upon the list that was certified and filed. It would be useless to describe the paper in question; it is sufficient to say that we do not agree with the argument that attempted to separate this certified list into detached parts, but that we regard it as a unit, and in this view it is plainly unobjectionable.

The second objection to the return of the jury was because it appeared that the sheriff had selected from the general list of sixty names, according to his judgment, the trial list of forty-eight names which had been served upon the prisoner.

This exception is not well founded. It is one of the functions of the sheriff to prepare the list of forty-eight names in the way he did in this case. The course of proceeding is prescribed in section 72 of the Criminal Procedure act, in these words, viz.: "In all cases where any prisoner or defendant, in or upon any indictment, is or may be by law entitled to peremptory challenges, and to have a copy of the panel or a list of the jury delivered to him previous to his trial, it shall be the duty of the sheriff, or other proper officer,

to select such panel or list of forty-eight jurors from the general panel or list of jurors at the term at which such prisoner or defendant is to be tried." *Rev., p.* 280.

The contention of the counsel of the defendant was that this provision had been modified by the act of 1881 (*Pamph. L., p.* 49), so as to require the names of all the jurors on the general panel to be put into the box and forty-eight names to be drawn therefrom, and the latter names so drawn to constitute the trial panel, a copy of which was to be served on the prisoner. But this is a misconstruction of the act referred to, for very plainly it does not have the effect ascribed to it. Its words are "that in all cases requiring a list of the jury to be served on the defendant, the names of the jurors *so served* shall be placed in and drawn from the jury box in the ordinary way." Thus it appears that it is not the names on the general panel, but the names on the list to be served on the prisoner, which are to be put in the box. The statutory purpose is plain. Before its passage the forty-eight names selected by the sheriff were called, in putting a jury in the box, in the order in which they stood upon the list, the consequence being that the officer had, in a measure, the selection of the persons who would try the prisoner, and which was a power liable to abuse, and hence the requirements in the later act to put these forty-eight names in the box and that they should be drawn therefrom as in ordinary cases. Since the passage of this act of 1881, this has been its interpretation and uniform enforcement in practice. The objection has not the least force.

But there is a second exception, arising from another matter comprised in this same challenge, which appears to the court to be of a very different character.

It is now insisted before this court that at the trial the panel containing the forty-eight names was objected to, not only on the ground just disposed of, but for the further reason that such trial list had been selected, not by the sheriff, as the act requires, but by such officer, with the co-operation of the prosecutor of the pleas of the county. The question thus

raised is manifestly a vital one, and therefore, in order that it may be entirely comprehended, I will set out the bill of exception relative to the subject in full. These are its words, viz.:

"Mr. Gaskill—We take exception to the method by which the forty-eight men were selected. We assert and offer to show that they were selected by the sheriff, not in accordance with the provision of the statute, which requires that the names shall be put in a box and taken out in the same way that jurors are drawn to sit upon the panel. In this case, they were merely penned off, or marked off by the officer, and were not placed in the box and taken from there. I refer the court to *Pamph. L.* 1881, *p.* 49. In cases requiring a list of jurors to be served on defendant, the names of the jurors so served shall be placed in and drawn from the jury box in the ordinary way.

"The panel served upon the prisoner was not properly selected by the sheriff. The names of all the panel of jurors are required by law to be put in the box, and the forty-eight names to be drawn and served upon the prisoner selected from the box, but in this case it had not been done in that way, but they had been selected by the sheriff and prosecutor of the pleas from the whole number of names on the panel, and not in compliance with the law.

"But the court, after hearing argument thereon, refused to sustain the said exception, or set aside said list, but ordered the jurors to be drawn from the list of forty-eight names aforesaid, to which decision and ruling of the said court the counsel for the prisoner excepted, and prayed a bill of exceptions, and that the same be sealed, and it is allowed and sealed accordingly.

"JOEL PARKER, *P. J.*        [L. S.]

"JAS. O. GLASGOW.        [L. S.]

"BENJ. P. WILLS."        [L. S.]

It will, from this recital, be perceived that the plain interrogatory put to this court is whether, in a criminal case, if

the defendant offers to show that the forty-eight jurors constituting the panel from which are to be taken the jurors to sit in his case have not been drawn from the box, but "have been selected by the sheriff and prosecutor of the pleas from the whole number of names on the panel," and such offer be overruled, such judicial action be or be not legal.

This is not a technical question, and consequently, should not be so treated by this court. It was suggested by the counsel of the state, in his argument before us, that this exception was not relied on before the trial court; that it was the other objection, and which has already been overruled, that was pressed; but of this we can know nothing. We have a certificate before us, under the hands and seals of the trial judges, that the exception was thus interposed, and we cannot be judicially informed as to the stress laid upon it in the argument of counsel in support of the challenge, nor if we had such knowledge, could it in any measure affect the result, for if the point be well taken, the feebleness of its presentation or of the argument in its support can detract nothing from its legal force.

My first thought was that the objection had not been presented in proper form, inasmuch as it is a challenge to the array and was not in writing. But reflection has satisfied me that the suggestion has not the force that it was supposed to have. In the first place, a mere technicality of this kind, whose tendency is to prevent an inquiry into the fairness of the proceedings in the selection of a jury to try a person on a charge of a capital offence, should not be allowed to prevail unless from the absolute constraint of law; and in the second place, although Mr. Chitty (1 *Crim. L.* 544) says that a challenge to the array must be in writing, I have failed to find any authority sustaining the assertion. This author himself makes no reference to the books in maintenance of his text; and upon looking into the reports, I find cases that are adverse to the proposition thus broadly stated. Thus, in 3 *Burns' Justice* 522, it is said: " And every challenge must be propounded in such a way as that it may be put at the time

upon the Nisi Prius record, so that the adverse party may either demur, or counterplead, or deny the matter of challenge." This seems to be all that is requisite; and it is obvious that this requisition has been complied with in the present instance. In the case of *Hoare* v. *Broom, Cro. Eliz.* 369, there occurs a challenge to the array, *ore tenus,* and which was acted upon by the court in a way that indicates, quite clearly, that the procedure was nothing unusual. See, likewise, *Bac. Abr., tit. " Jury."*

Besides this, if it appeared to be the practice at common law to put in these challenges in writing, even then I should be unwilling to apply the rule to this case in its present position; for this challenge was, in point of fact, put in writing by the stenographer in the presence of the court, and was considered and passed upon by the court, and has been formally certified to this court as a part of the record of the proceedings. To turn aside from the decision of a question thus presented, on account of its want of correspondence to an uncertain mode of practice, would seem to me more like an effort to avoid than to discharge a judicial duty.

It may well be that in point of fact there is no substance in this objection, but it is not within our province to decide that question. If, as the matter now stands, we were at liberty to draw a conclusion, we would say, without a moment's hesitation, that these facts alleged in this challenge are not and cannot be true. From the character and high professional standing of the officer whose intervention, it is claimed, has illegalized the process in question, we would say that to a moral certainty he has committed no intentional wrong, and from his well-known prudence, that it is highly improbable that any error has crept into the proceeding from an inadvertence. But such inferences as these have no place in this inquiry; on the contrary, by the plainest rules of law, we must, in the solution of the problem before us, assume as true the exact opposite of the conclusions above indicated. The rule is imperative, in the present condition of the question, that we must consider those things true which the de-

fence offered to prove and was not permitted to prove. The consequence is we must accept as a *datum* given to us by the law that as a fact the public prosecutor co-operated with the sheriff in the selection of this panel, from which the jury that tried the defendant was taken.

The result from such a premise cannot be a matter of doubt. There has never been a time in the history of the common law when an act of this nature would have failed to vitiate the jury panel. Such interferences have always been regarded as matters of substance, for an impartial trial would seldom occur unless the selection of the jury be impartial. "If any one or more of the jury be returned," say the books, "at the nomination of the party plaintiff or defendant, the whole array shall be quashed." 3 *Burn's Justice* 517. In the case before us, the allegation is that the representative of the state participated in the choice, not of one or two of the jurors, but of the entire panel. The sheriff is presumed to be indifferent and therefore impartial, and hence he is trusted with this highly important function. If it happens that he is interested in the litigation, he is known as the actor in returning the jury, and when the occasion calls for it, his acts can be challenged; but how could a party protect himself against the machinations of an unknown assistant of the officer, whose interest or malice, it may be, had perverted the process of the law into an instrument of injustice or oppression? If the agent of the state could thus take part in the nomination of the jury panel, so could the defendant, and yet who would doubt that a jury thus obtained would be set aside at the instance of the public. It is an essential in such procedures that the least unauthorized interference with the choice of jurymen should be rigidly and entirely prohibited. The defendant had the clear legal right to show that the panel in question had not been properly selected, and we think that the refusal of the trial court to give him an opportunity to verify by proof his allegations in this respect constitutes such an error in law as vitiates the conviction.

I am likewise of opinion that there is another fatal error in the conduct of this trial.

There were certain so-called dying declarations that were permitted, against objection, to go to the jury as legal evidence. After full examination of the subject, I am entirely satisfied that the first of this series had no evidential value, and ought not to have been received by the court.

The particular declaration to which reference is made was offered under the following circumstances:

On the morning of Tuesday, the 8th of February, 1887, Katie Anderson, as she was generally called, was found by the roadside in a semi-conscious condition. There was a wound apparent on the left side of her head, caused by a pistol-ball that had traversed her brain. She was carried to the house of her aunt, who was the mother of the defendant. She exhibited no signs of being in acute pain, and she knew, when aroused from the stupor in which, for the most part, she lay, her father and mother, and spoke to them in detached sentences; but when she thus spoke it was rationally and to the purpose. On the following day she was moved to her father's house, and it was on Friday, the fourth day after the wounding, that she made the statement now in question.

To manifest the condition of the girl, and that she believed that death was impending, the state introduced the following testimony:

Her sister, Eva, was asked whether she remembered what the doctor said to Katie on this occasion, and she said, "Yes; he told her she was liable to die any hour, and asked her if she expected to get well, and she said, 'No; she didn't expect to get well, but she would like to get well.'"

The doctor himself describes what passed at this interview. He was thus interrogated:

"*Q.* Do you remember whether you said, in Katie's presence, as to her liability to die at any hour?

"*A.* Yes, sir; I repeated it.

"*Q.* I am speaking of that morning?

"*A.* Yes, sir; I said so that morning.

" *Q.* What did you say ?

" *A.* I said she was liable to die at any moment.

" *Q.* Did you say that to her ?

" *A.* Yes, sir ; I said it at the bedside.

" *Q.* It was sometime during that interview that the mew-ing of the cat took place in the room ?

" *A.* I remember.

" *Q.* Did you ask her what the cat said ?

" *A.* I don't remember whether I asked her, or whether it was Eva; and she said ' mew ' [illustrating] in a smiling way.

" *Q.* Katie smiled, and said ' mew ' ?

" *A.* Yes, sir."

Then he asked her if she was fond of oranges, and she said she was.

The cross-examination elicited these further answers, viz. :

" *Q.* Then all the way through this treatment of the girl you held out to her that there was no hope ?

" *A.* I did, sir.

" *Q.* Not a possible chance to live ?

" *A.* Only through an operation.

" *Q.* You did not hold out the hope that she might live ?

" *A.* That there might be ; that would be the only chance for her recovery.

" *Q.* You had told her that, had you not ?

" *A.* Yes, sir.

" *Q.* When did you tell her that ?

" *A.* I told her that previous to the 13th—to the first operation.

" *Q.* How long previous to that ?

" *A.* I think about two days ; I think it was on the 11th I made that remark to her."

The eleventh was the day on which the declaration now under investigation was made, and this was the entire ground laid by the state for the legalization of such declaration.

The method in which it was obtained is thus described by the aunt, who was present :

" *Q.* What did you hear Katie Anderson say—whom did you hear question her?

" *A.* Eva.

" *Q.* Her sister, Eva?

" *A.* Yes, sir; she had her on her arm at her head, leaning on her body and her arm together.

" *Q.* State what was said between them?

" *A.* I heard Eva ask her how it happened, and she said to her, 'Did you do it yourself,' and Katie said, 'No;'" that is the first I heard; and Eva then mentioned over two gentlemen I didn't know at all, and she said, 'No.'

" *Q.* Be a little more particular and state what she did mention?

" *A.* She asked her—I can't tell the man's name.

" *Q.* State what she said in connection with some man's name, or person's name?

" *A.* There was one by the name of Pugh—not Pugh, Poole; she asked if he did it, and Katie spoke quite short, I thought, and said, 'No;' then she asked her some one—but that one I can't recollect; then Eva said, 'Who did;' 'Why,' she said, 'Barclay,' or she said 'Bart,' just so; and Eva looked at her and said, 'Are you certain?' and she said, 'Yes; if he denies it fetch him here and I will face him on it.'"

Upon a careful consideration of the testimony thus recited, no legal ground has been found that will justify the admission of the foregoing statement. The fundamental principle touching the admissibility of testimony of this class is that the person making the declaration shall have a complete conviction that death is at hand. The burthen is on the state to show that such absolute conviction is present. Death, shortly to ensue, must be an absolute certainty, so far as the consciousness of the person making the accusation is concerned. If there is the least hope, no matter how faint, the requisite certainty of belief does not exist. This rule is so completely established that it is not open to discussion.

The doctrine was declared and defined, with succinct completeness, in the carefully considered case of *Regina* v. *Jen-*

*kens, L. R.*, 1 *C. C. R.* 191, in the following quotation: The Chief Baron says: "The question is whether this declaration, as it now stands, was admissible in evidence. The result of the decisions is that there must be an unqualified belief in the nearness of death, a belief without hope that the declarant is about to die. If we look at reported cases, and at the language of learned judges, we find that one has used the expression, 'Every hope of this world gone;' another, 'Settled, hopeless expectation of death;' another, 'Any hope of recovery, however slight, renders the evidence of such declarations inadmissible.' We, as judges, must be perfectly satisfied, beyond any reasonable doubt, that there was no hope of avoiding death; and it is not unimportant to observe that the burthen of proving the facts that render the declaration admissible is upon the prosecution."

In the case of Donnelly *v.* State, the rule will be found to be expressed almost in the same words, both of this court and the Court of Errors.

The testimony now in question will not, it is very apparent, stand the test of this principle. Neither the expressions used by the deceased, nor the expressions addressed to her, nor the surrounding circumstances, indicated a consciousness that death was absolutely certain and was close at hand. She said no, she *did not expect* to get well, but she would like to; expectation implies probability, but not certainty; we expect the probable will happen, but we know the certain will occur. The words used by her convey, in their usual and natural meaning, that there was a possibility, but not a probability, that she would survive.

Nor is it possible to believe that what the doctor said to her left her without hope. He told her she *might die* at any moment, but he did not say it was certain that she would die, but, on the contrary, told her there was one hope and that was in an operation that was to be performed in a short time. I find no case, when a hope has been expressed by the surgeon to the patient, in which the declarations of such patient have been held admissible. The decisions are all to the con-

trary.   Several of them are referred to by Mr. Roscoe in his Criminal Evidence (page 30.)   This is one of them: The deceased asked his surgeon if the wound was necessarily mortal, and on being told that a recovery was just possible, and that there had been an instance where a person had recovered from such wound, replied, "I am satisfied," and after this made a statement.   It was held by Chief Justice Abbott and Justice Park to be inadmissible as a declaration *in articulo mortis*, since it did not appear that the deceased thought himself at the point of death, for being told that the wound was not necessarily mortal, he might still have had a hope of recovery.

And this was, substantially, the expression of medical opinion in the present instance, for the patient was here informed that the wound was not necessarily mortal, as a ground for hope from the anticipated operation.

These expressions thus used by the deceased and by the physician, and which were repellant of the conclusion that death was deemed to be certain and imminent, were not controlled by the circumstances attendant at the time of their utterance.   The physical and mental condition of the deceased had perceptibly improved during the four antecedent days, and she lived afterwards for several weeks ; during the interview comprising her declarations she was cheerful, imitating the mew of the cat, and smiling at her effort.   She received her aunt with pleasant surprise, exclaiming : "Why, Aunt Jane, is that you?"   In short, there was not the faintest trace of those feelings of fear or awe, or religious resignation, which are so generally exhibited by women when they know that they stand in the very shadow of death.   It was said, in the Donnelly case, that it was the "solemn circumstances" present at the dying hour that is supposed to "create a sanction equally impressive with that of an oath administered in a court of justice."   In the instance before us there were no " solemn circumstances."

As the state, therefore, failed to show, by what was said to the deceased, or by her own expressions, or by the conditions of her situation, that she believed, with absolute certainty,

that death was at hand, her declarations thus made were, in my opinion, plainly inadmissible.

Before parting from the case, and as it must be retried, I am impelled to say a few words expressive of my own personal views, with respect to its general aspects.

No case seems to me better calculated to serve as an impressive monition against giving too great an effect to statements made by persons in a dying condition. Such statements almost invariably exercise an undue influence over juries, and hurry them into extremes. In the estimation of judges such statements are full of dangers, and on this account their admissibility is determined by a strict measure. "Dying declarations," such is the language of the opinion in the case cited from the *Crown Cases Reserved,* "ought to be admitted with scrupulous, and I had almost said with superstitious care. They have not necessarily the sanction of an oath; they are made in the absence of the prisoner; the person making them is not subject to cross-examination, and is. in no peril of prosecution of perjury. There is also great danger of omissions, and of unintentional misrepresentations, both by the declarant and the witness."

It was evidence of this dangerous kind which, in the main, led to the conviction of this defendant. In the absence of testimony of this class, a verdict against him would not have rested on any reasonable basis, and yet it is very clear that the declarations which played this thoroughly important part were marked, not only by the imperfections natural to such testimony, but were also deformed by certain conditions of their own. They were not voluntary statements, but were obtained by solicitation from the wounded girl when half aroused from a state of unconsciousness; they were the products of interrogations and suggestions; there were a number of them, each in the presence of several persons, and yet no two witnesses agree precisely as to the very words spoken, and in some instances such testimonies are widely variant. And these statements were all made after the arrest of the defendant, and it is obvious that those who heard them believed in his guilt, and

were therefore subject to that bias which naturally exists in those who are performing the duty of hunting down a criminal. And, finally, we are not to forget such testimony is made up of fragmentary expressions, unexplained and unexplainable, in which the change of a word, or of its collocation, may either take or save a life. It is consequently manifest that here was a train of evidence, of most dangerous tendency, calling for the closest scrutiny and the most vigilant supervision on the part of the court.

By this criticism it is not to be implied that an opinion is indicated that the defendant should not have been convicted as a guilty participant in this tragedy. That, under all the evidence in the cause, was a question that the jury could, not unreasonably, resolve as they have done; but the gravest doubt arises, in my mind, when we proceed to inquire for evidence, in a satisfactory form, showing that the homicide in question was the intentional act of the defendant. It has been so declared by the jury, and in this particular, this verdict seems so questionable as to give rise to the inference that these dying declarations have been possessed of an unwarrantable efficacy.

This attribution to this defendant of a preconceived purpose to take the life of the deceased girl, appears to me to be opposed by two of the prominent features of the case.

In the first place, there seems to be an absence of all proof of a homicidal motive. The prosecution assigned jealousy as the cause; but the suggestion seems to me, after a careful study of the testimony, to stand upon no foundation whatever. I have found neither the existence of such a passion, nor any reason for its existence.

This consideration should be of great weight; but it is not conclusive. But what are we to say of the conduct of the defendant immediately after the homicide?

It has been already stated that the deceased girl was found early on Tuesday morning by the roadside, in a nearly unconscious condition, whence she was taken to the house of her aunt, who was the mother of the defendant. At that point of time the defendant himself was at the house of a neighbor,

Peak v. State.

and was there informed of the finding of the wounded girl, and that she had been taken to his mother's house.

Assuming that the defendant had acted the part of an assassin, certainly a more terrific annunciation than this could not have been made to him; he had left his victim in supposed death by the wayside, and he was now told that she was alive. Could he doubt that she would denounce him as her slayer? And yet, witness his conduct. He at once hastened to his home, and found the neighbors in the act of laying the wounded girl on the bed; he instantly went to her and kissed her, asking: "Katie, who hurt you?" She made no reply. Then he sat by her for some time, holding her hand. Her mother arrives, and is recognized, and her father says to her: "Katie, this is too bad!" and the reply is: "Yes, father; but I couldn't help it." Again, on the following morning, the defendant, in the presence of her mother, kissed the deceased, she kissing him, and he again asked: "Katie, who shot you?" the response being: "Well, he is a nasty, dirty rascal." Again, he pressed the question, and the reply this time the mother could not remember. Shortly after this, the doctor came, who, with the mother, being alone in the room, endeavored to get the girl to disclose the manner in which she had been hurt, and failing in the effort, they resolved to call in the defendant, in the hope that she might make the disclosure to him. Under these circumstances, the defendant, without a moment's hesitation, upon being summoned, went into the sick room, and in the presence of the doctor and the mother said, three several times: "Katie, who shot you? Won't you tell me who shot you?"

This evidence appears to me to be utterly averse to any theory of the case involving the assumption of an intention to commit this homicide on the part of the defendant. I do not believe that any man in the possession of his senses ever has, or ever will, stand under such circumstances as are here presented, in the presence of his victim, and importune that victim to denounce him as the murderer.

These solicitations, as matters of evidence, are nowise in

dispute, for they were proved on the part of the state; and their effect on my mind is to lead me to the opinion that it would be unsafe, and indeed illegal, to permit, as matters stand, a conviction of the crime of murder in the first degree. An intent to kill is an element of that offence, and the ascription of such an intent, as has been said, is out of harmony with this part of the conduct of this culprit. An hypothesis, founded on the proofs, that involves criminal misconduct of the defendant, can be readily formed, and which would not conflict with the circumstances just stated, for if we eliminate from the charge of homicide the imputation that the act was done purposely, all difficulties of the kind referred to are at an end. A case of the sort may be readily put. Let us suppose this girl and the defendant met by appointment in the lane where the shooting occurred, and that such meeting had been arranged may well be said to be indicated by the proofs. There is much also in the testimony to justify the belief that the girl, on the day before, had, in a playful manner, taken the defendant's pistol from him, saying that he would hurt some one or himself with it; she may, therefore, have carried it with her to the place of meeting to return it. Then, add the supposition that having thus met—it was at a lonely place and in the evening—the man committed an indecent assault upon the girl, and that she produced the pistol, and in the struggle for its possession it was accidentally discharged, and thus the fatal wound was inflicted.

It is obvious that such a theory, unlike that involving an intent to kill, will harmonize with all that we know of the case. It would at once dissipate the objections arising from the absence of motive, and the presence of repeated importunities on the part of the defendant to get statements from the deceased. It would agree with all the dying declarations; the girl said, in one of them, that he watched at the end of the lane, which would be a natural occurrence if they met by appointment; she said it was "Bart shot her," or "Bart did it," a statement not inconsistent with an accidental shooting, if the weapon was in defendant's hands at the time of its

discharge; so it would agree with the strange circumstance that she was reticent, and at all times reluctant to ascribe the act to him, and that on no occasion did she exhibit towards him the least anger, or ever blame him. If he had shot her down in cold blood, how is such conduct on her part to be accounted for? Would she not have recoiled from him, and at once have proclaimed him her murderer? Instead of this she kissed him, and spoke to him without excitement. We readily account for this conduct on some such theory as that of an accidental shooting; and we also see why it was that the defendant so pressed the girl to speak on the subject, for if he could procure from her such a version of the affair it would avert from him the terrible charge of murder which was then impending. It was in evidence that the morning after the occurrence he said, confidentially, to a friend, that "if Katie tells her story I will tell mine, and it will take a great load off my shoulders." It is certain that he tried, in good faith, to induce Katie to tell her story, whatever it was.

And so the girl's description of the person wounding her as "a nasty, dirty rascal," does not suggest the idea of a murderer, but an assailant of the kind supposed; and her answer to her father's remark that it was "too bad," "Yes, father, but I couldn't help it," is also strongly suggestive of the element of accident in the transaction.

There are other harmonies that might be pointed out, but enough has been said for the purpose in hand; the proofs in the case are consistent with the imputation to the defendant of a lesser crime than that of murder in the first degree, while they cannot, as it seems to me, be made to support, in a satisfactory manner, a conviction of this latter crime. I have entirely failed to see how the state can be said to have proved, beyond a reasonable doubt, that this homicide was the high crime of murder in the first degree.

These suggestions, proceeding from myself alone, have been made so that the case, in these aspects, may receive consideration at the retrial.

Let the judgment be reversed, and a *venire de novo* issue.

DIXON, J.    I do not dissent from the judgment of re-versal pronounced in this case, but I cannot concur in the ruling of the court upon the subject of "dying declarations."

The admissibility of these declarations at the trial of the plaintiff in error for the murder of Catharine Anderson, depended upon the preliminary decision of a question of fact. That that question of fact was correctly apprehended by the court below is manifest from the terms in which it was stated by the learned justice who presided at the trial, when announcing the decision of the court upon the admission of the declarations.    He said: "Before 'dying declarations' are admissible in evidence, it must appear that they were made under the consciousness of what is termed 'impending death,' * * * a present apprehension and belief that death will certainly come from the effect of the wound; that it is near at hand and may at any moment seize the declarant.    A wounded person may not die for days or weeks after making the declarations, yet if at the time they were made, he believes he will not recover, that he will surely die of the wound, and that death may come speedily, he has a sense of impending death which will render the declarations admissible.    The evidence is admissible, if the testimony shows, from all the circumstances that he expected to die from that wound speedily, that hope of recovery had departed, and that he was fully conscious of approaching dissolution."    The learned justice also quoted the language of Chief Justice Green and of Mr. Justice Ogden in the case of *State* v. *Donnelly*, as reported in 2 *Dutcher* 500, 618.    These statements embody the legal rule on this subject as it exists in New Jersey.

The next point of our inquiry concerns the decision by the court below of this preliminary question.

It must be borne in mind that the matter comes before us by writ of error.    We are not dealing with a rule to show cause, or a certified case, or a case reserved, where we might consider the evidence at large as if a trial court; but we are dealing with a writ of error, where the only matters open for

review are questions of law. *Cox* v. *Drake*, 17 *Vroom* 167. Now, undoubtedly the preliminary question above referred to was one of fact. What state of mind must be shown to render a declaration admissible in evidence as a dying declaration is a question of law; but whether in the particular case that state of mind exists is a question of fact. The decision of that question cannot be reviewed on writ of error. But behind the decision of such a question, and necessarily entering into it, there is another question, viz. : Whether the evidence relative to the fact is such as furnishes legal support for the decision rendered. This question is one of law, and therefore open to review on error. Such seems to be the opinion expressed by Chief Justice Green in *State* v. *Donnelly*, 2 *Dutcher* 498, 500, where he said, in discussing the subject: "Upon the mere credibility of the testimony upon this preliminary issue, the decision of the court below must be regarded as final. * * * The question here is not a question of the weight of testimony, but whether there were facts before the court below which warranted them in admitting the evidence of" the declarations of the deceased. While this language is not so perspicuous as usually were the judicial utterances of that distinguished jurist, I deem its purport to be that which I have above stated. At any rate, I am unable to put the question in any form which will be broader than that above proposed and yet will keep the question one of law and not of fact.

The question thus stated is simply one of ratiocination. Legal evidence relevant to a question of fact affords legal support for any decision of the question which is a reasonable deduction from the evidence. The decision need not be that deduction which to the judge sitting in review appears the most reasonable; it is enough if he can see that it has been drawn from the evidence by the exercise of the reasoning faculty in normal operation.

So considered, I think it plain that the decision of the court below, to the effect that Catherine Anderson, on February 11th, when she made the declarations which are now

adjudged inadmissible, was in such a frame of mind as rendered her statements "dying declarations," had legal support in the evidence.

The pertinent facts which had then been directly proven were thus summarized by the learned justice presiding at the trial, the quotations being made from the bill of exceptions:

"On Monday, the 7th day of February last, Katie Anderson, a young girl of sixteen, light of heart and buoyant in spirit, physically well developed and apparently in perfect health, in the early evening, left the house of her employer, with nothing but a shawl upon her head, as if to be only temporarily absent. She did not return. Early the next morning she was found by the roadside, not far from the end of the lane which leads to the house which she had left the previous evening, with a wound in her head, caused by a ball shot from a pistol. She was paralyzed in body and almost totally unconscious. It was found upon examination that the bullet had gone almost through the brain. The wound was a terrible one, and baffled the skill of eminent surgeons. On Friday, the 11th day of February, Katie Anderson became conscious. The immediate effect of the concussion or shock had passed away, and compression had scarcely begun to do its work. The attending surgeon, observing her return to consciousness, believed it his duty, in view of her critical condition, to have her make a statement of the circumstances attending the shooting. Accordingly, Dr. Brown, on the morning of that day, told her that in her condition of impending death, she ought to state how she came by that wound. The doctor told her she was liable to die at any moment. Then her sister told her she ought to say something, and she expressed her willingness to make a statement. Katie was raised up at her request; she asked for a drink of water, which was given her. Then the doctor repeated to her what he had before said about her impending death and her danger of dying at any moment. Katie then repeated a few words in prayer. She was then asked by her sister if she expected to get well, and she said, "No." It was under such circumstances, with

the bullet still in her brain, with her limbs paralyzed and almost motionless, the family at her bedside, her faithful surgeon notifying her of her critical condition, her danger of dying at any moment, that she expressed her belief that she would die, that she would not get well; and after breathing a prayer to her Maker, she made the declarations as to the shooting which it is proposed to put in evidence. The court think that when, on the morning of the 11th of February, she made those declarations as to the shooting, Katie Anderson was under a sense of impending death."

Besides the facts thus enumerated, there were two or three other circumstances which might be regarded as suggestive of her mental condition. One was that a cat, in the room, having mewed, she was asked what the cat said, and she answered in a smiling way, " Mew;" and being also asked whether she liked oranges, she replied that she did. This conversation I understand to have been held before she was told of her liability to die at any hour, and with the design of learning whether her consciousness had fully returned. So viewed, it seems unimportant on the present inquiry.

Another circumstance was that when asked if she expected to get well, she added to her negative response the remark that she would like to get well. This, possibly, may have resulted from a lurking hope of recovery, but more probably it sprang from that " longing, lingering look " with which youth, at least, is apt to leave " the warm precincts of the cheerful day." Its real source the trial court alone could legally determine.

A third circumstance may, perhaps, be gathered from the following cross-examination of the physician :

" Q. Then all the way through this treatment to this girl you held out to her that there was no hope ?

" A. I did, sir.

" Q. Not a possible chance to live ?

" A. Only through an operation.

" Q. You did not hold out the hope that she **might live** ?

" *A.* That there might be; that would be the only chance for her recovery.

" *Q.* You had told her that, had you not?"

" *A.* Yes, sir.

" *Q.* When did you tell her that?

" *A.* I told her that previous to the 13th, to the first operation.

" *Q.* How long previous to that?

" *A.* I think about two days; I think it was on the 11th when I made that remark to her.

" *Q.* Did you not give her any encouragement?

" *A.* No, sir; I never gave her any encouragement.

" *Q.* And during the whole two weeks, the first two weeks of her sickness, you never held out to her a particle of encouragement about there being a possible chance for her recovery?

" *A.* Never at any time.

" *Q.* You never spoke an encouraging word to her?

" *A.* Never, sir.

" *Q.* You never said anything to her that would lead her for an instant to hope that she might possibly recover from the effects of this injury?

" *A.* Never, sir."

With regard to this testimony, several remarks are obvious. First, the meaning of the witness is uncertain; with one breath, he says he had told his patient that through an operation would be the only chance for her recovery; with the next, he avers that he had never said anything to her that would lead her for an instant to hope that she might possibly recover. Secondly, it is left doubtful whether he had spoken of the operation before she made the declarations which were received in evidence. These declarations were made on the morning of the 11th; the witness saw the patient on the evening also of that day, and no preparations for an operation were made till the 13th. Thirdly, it is by no means clear that the physician's remark about a chance through an operation created any hope in the patient's mind. She saw no attempt to perform an operation. She was told that death

was impending, liable to come at any hour, and she never wavered from her statement that she did not expect to recover. While in all this I see ground for debate as to her mental condition, I see no ground for a judgment that the conclusion of the court below on this point was unreasonable, and therefore legally erroneous.

In my opinion there is no error in this branch of the record.